## RICE v. CHARLES DREIFUS CO. et al.
### No. 238.

Circuit Court of Appeals, Second Circuit.
April 4, 1938.

Philip Novick, of New York City (Max Rockmore, of New York City, of counsel), for appellant.

Hill, Rivkins & Middleton and Thomas H. Middleton, all of New York City, Advocate for Charles Dreifus Co.

Lynch, Hagen & Atkins, of New York City (Anthony V. Lynch, Jr., and John S. Bull, both of New York City, of counsel), for libelant.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The Williamsburg-Flushing Scrap Iron Corporation appeals from a decree in the admiralty holding it primarily liable for

injury to the libelant's scow Elizabeth R, while being loaded with fabricated iron and steel at a pier at the foot of Gansevoort street, North River. In July, 1936, the Dreifus Company had agreed in writing to buy some fabricated iron and steel of the Williamsburg-Flushing Scrap Iron Corporation, which that company was to deliver alongside scows at a wharf at the foot of Gansevoort street. When the Williamsburg Corporation began delivery in August, the Dreifus Company engaged two of its employees to help in the lading, but the longshoremen's union objected to this and insisted upon union men, and the Dreifus Company yielded. The work dragged, however, and it was necessary that it should be supervised; one, Mitchell Lachow, a nephew of Michael Lachow, secretary of the Williamsburg Corporation, was employed about the scows, and the case turned upon whether through him the Williamsburg Corporation assumed supervision of the lading. A number of barges chartered by the Dreifus Company were laded between August and October, among which was the Elizabeth R, owned by the libelant, Rice, which he had chartered to the Dreifus Company. In September, while this scow was being laden with the iron and steel, her decks were crushed because of insufficient dunnage; all agree that the Dreifus Company is liable for this damage as charterer, and the only question is whether Mitchell Lachow was in charge and the Williamsburg Corporation was his employer. Rice sued the Dreifus Company upon his charter, and the Dreifus Company impleaded the Williamsburg Corporation under the Fifty Sixth Admiralty Rule, 28 U.S.C.A. following section 723. The judge entered a decree primarily against the Williamsburg Corporation; while its appeal was pending, a judge of this court allowed it to amend its answer by alleging a release of the Dreifus Company, and allowed that company to reply by alleging that, if the release was broad enough to cover the claim, it was executed and delivered by mutual mistake and should be reformed. One, Springstead, the owner of another one of the scows which the Dreifus Company had used, had brought suit against both the Dreifus Company and the Williamsburg Corporation, in which the Williamsburg Corporation had pleaded the release and in' which testimony had been taken bearing upon its reformation. This testimony was by consent incorporated into this suit upon the issues raised by the amendments just mentioned, and the case comes before us upon the whole record so made up.

As we have just said, the only question raised by the original pleadings was whether Mitchell Lachow superintended the loading of the scows and was the servant of the Williamsburg Corporation. The contract did not impose upon the seller any duty after the iron and steel were laid on the wharf alongside the scows, but both Dreifus and Lachow agreed that Lachow had at least promised to furnish laborers to help unload the trucks and swing the beams aboard; and Dreifus swore in addition that after three or four days Lachow came to him and spoke of the trouble he was having in making deliveries according to contract, and suggested that he, Lachow, should supply his nephew, Mitchell, to supervise the work at $5 a day. Dreifus agreed, and Mitchell Lachow appeared and, according to Brown, an employee of Dreifus, took charge of the lading; Brown was corroborated in this by one of the longshoremen who worked on the job. Michael Lachow told a different story; he said that Dreifus only wanted a man to help take the beams off the truck, and that he had said that his nephew, a young man in college, would be able to help; but that it was Brown who hired the men and paid them. The judge accepted Dreifus's story, and we see no reason to upset his finding, whatever we might have thought ourselves. The fact that the Dreifus Company repaid the Williamsburg Corporation the wages which it had paid to Mitchell Lachow is not of consequence. If the case ended as it did in the District Court, we should have affirmed the decree without opinion. It is the issues introduced in this court which require discussion.

The Dreifus Company and the Williamsburg Corporation fell into differences regarding the execution of the contract we have mentioned, and the Williamsburg Corporation sued in the municipal court for goods sold and delivered. The Dreifus Company counterclaimed for delay in delivery; and while the action was pending, the parties came to a composition on February 19, 1937, by which the Dreifus Company executed and received a release and made a payment. The general terms of this release concededly cover any claim which the Dreifus Company might have

arising out of the negligence of Mitchell Lachow, and it is curious that the Williamsburg Corporation made no effort to plead it in this suit until after appeal. The Dreifus Company asserts that in spite of its language the release was not intended to cover anything but the controversy in the municipal court; and the evidence leaves no doubt in our minds that this is true. On February 5, 1935, Solinger, Dreifus's attorney, wrote Novick, the attorney of the Williamsburg Corporation, that his client had just told him that the parties had reached an agreement by which the Dreifus Company was to pay the Williamsburg Corporation the balance of the purchase price upon the contract, less $175. Three days later, on the 8th, Novick answered, stating the terms of the proposed settlement. This letter concluded as follows: "As a further condition of the said settlement it was agreed that all litigation was to be discontinued and releases exchanged. This discontinuance of the litigation includes not only the present action in which you appear for Charles Dreifus Co., but also the action in Admiralty now pending in the United States District Court for the Eastern District of New York, where another attorney represents your client." Thus the precise issue was expressly raised. Solinger did not answer at once, but, as Novick admitted, told him on the telephone that Dreifus would not consent to a discontinuance of the admiralty suit because the matter was in the hands of his underwriters. Thereupon Novick asked for a written statement from Dreifus of the facts relevant to the liability of the Williamsburg Corporation in the suit at bar, and wrote a letter on the 11th which concluded with the request that Dreifus should embody these in an affidavit, "and we shall accept the same in lieu of a discontinuance of the action in the federal court." It is clear therefore that before the 11th Dreifus, as he testified, had told Lachow that the settlement of the admiralty suit was not within his power, and that Novick had agreed not to insist upon it, provided he could get the statement which he wished. Novick also admitted that he talked with Solinger on the telephone after Solinger had received his letter of the 11th and that Solinger then told him that Dreifus would not sign any statement, and Dreifus followed this by a personal refusal. It was some days later that Novick asked Solinger to prepare the release.

Therefore beyond peradventure the parties did not understand that the release was to cover the cause of suit at bar, and the only question is whether these facts are available by way of reply to an answer in a suit in the admiralty.

It is true, no doubt, that the admiralty has no jurisdiction over a libel to reform a written instrument. Justice Story so decided in Andrews v. Essex Fire & M. Ins. Co., 1822, 3 Mason 6, Fed.Cas. No. 374, and his holding has been again and again approved. The Eclipse, 135 U.S. 599, 10 S.Ct. 873, 34 L.Ed. 269, is the chief authority in the Supreme Court upon the incapacity of an admiralty court to entertain equitable causes of suit; there, a petition of cestuis que trustent who tried to intervene and assert their equitable rights, was refused. In United Transportation & L. Co. v. New York & Baltimore T. Line, 2 Cir., 185 F. 386, we refused to consider on the merits a cross-libel depending upon the reformation of a contract before any relief could be granted. With the exception, however, of Meyer v. Pacific Mail S. S. Co., D.C., 58 F. 923, and Koninklijke Nederlandache Stoomboot Maatschappij v. Yglesias & Co., D.C., 37 F.2d 103, we have found no decision that when a release, accord and satisfaction, account stated, or other transaction of discharge is pleaded to a claim justiciable in the admiralty, the court will not pass upon any facts in avoidance which would be good in equity; but that the libelant must file a bill in equity to enjoin the defense. Certain it is that in libels for seamen's wages courts of admiralty have again and again felt themselves not so limited, though it must be owned that the point was always assumed sub silentio. Whiteman v. Neptune, 1806, 1 Pet.Adm. 180, Fed.Cas. No. 17,569; Thompson v. Faussat, 1815, 1 Pet.C.C. 182, Fed.Cas. No. 13,954; The David Pratt, 1839, 1 Ware 509, Fed.Cas. No. 3,597; The Topsy, D.C., 1890, 44 F. 631; The Adonis, 3 Cir., 1930, 38 F.2d 743; Harmon v. United States, 5 Cir., 1932, 59 F.2d 372. Luckenbach S. S. Co. v. Berwind-White Coal Co., 2 Cir., 7 F.2d 793, arose upon a libel for demurrage to which the respondent pleaded what was in effect an accord and satisfaction, which the libelant met by an allegation of mutual mistake, incorporated into its libel by amendment. We held that since the cause of suit was itself maritime, we might dis-

pose of it altogether and at once, and we considered the matter in avoidance upon its merits. Southern Cotton Oil Co. v. United States, 5 Cir., 84 F.2d 509, involved the same question, and, while the court did not apparently observe the point of jurisdiction, it too considered the merits.

▮ The supposed embarrassment appears to us to result from failing to consider why it was ever necessary to resort to a court of chancery to avoid a transaction of discharge. A court of law was entirely indifferent to how a release or other discharge was obtained, provided indeed that the obligee meant to execute it. Fraud, mistake, duress, and other circumstances to which equity was sensitive, were wholly irrelevant to it. The discharge was a good bar, if it was once proved; hence it was crucial for the plaintiff in some way to prevent the defendant from pleading it, else his action was lost. He could only do that by getting an injunction from a court of equity, and indeed if the defendant had the hardihood to defy the chancellor, even the injunction was fruitless. When, however, a defendant in equity pleaded a release or the like, it would have been absurd for that court to require the plaintiff to file a separate bill to enjoin its use, because any facts which would justify an injunction, would be good avoidance. Such matter therefore was always pleadable in the main suit, and if special replications had not been abolished (Street, Federal Equity Practice, § 790), it would not have appeared until the plaintiff replied. However, after general replications alone were permissible, the plaintiff's only course was either to avoid the plea in his bill in anticipation, or to amend after the defendant had pleaded it. Op.cit. §§ 791, 1093. Courts of admiralty have always professed to proceed upon equitable principles, unlike courts of law; therefore if they were not to recognize equitable avoidances of transactions of discharge, it could not be because in substance the facts were irrelevant, but for some procedural reason. However, procedure in the admiralty is proverbially plastic and no such reason exists; it must therefore be possible to reply to a release by showing grounds for reformation. We think it is. The question is of much importance, because if we are wrong, the defect would be beyond the power of Congress, being a limitation upon the constitutional powers of the admiralty court. That jurisdiction depends in our judgment altogether upon the cause of suit which the libelant brings before the court; if that be once maritime, the court may dispose of it completely without the need of any other suit in the same, or any other court; it is omnicompetent within its sphere. We do not of course mean that this extends to the entertainment of causes of action, or causes of suit, by way of cross-libel, counterclaim, or set-off, which are not themselves maritime; that is another question, and we need not concern ourselves with it now.

Decree affirmed.